13873

HOOD v. LIFE & CASUALTY INS. CO. OF TENNESSEE *ET AL.*

(175 S. E., 76)

*Messrs. Moreau P. Estes* and *John F. Williams,* for appellant,

*Messrs. Spencer & White,* for appellant,

140

*Messrs. Dunlap & Dunlap* and *Hemphill & Hemphill,* for respondent,

June 14, 1934.

The opinion of the Court was delivered by MR. JUSTICE STABLER.

This is an action for damages based upon fraud and deceit alleged to have been practiced upon plaintiff by the defendant company through its agent Catlin.

The plaintiff alleged, *inter alia,* that in March, 1930, she learned that her brother, Ben O. Hood, had with the defendant company a health and accident policy of insurance, in which she was designated as beneficiary, and that he was thinking of discontinuing it; that pursuant to a notice sent the insured—which fell into her hands—of the due date of the annual premium, she went to see the defendant Catlin, who was the agent of the company, about the matter; that after telling him that she was the sister of the insured, she inquired as to what kind of policy it was, the kind of protection it afforded, and the amount of the annual premiums; that Catlin told her that her brother had with the company a health and accident insurance policy in the sum of $2,500.-00, that she was the named beneficiary, and that the annual premium was $5.00; that the "policy covered any and every kind of accident, that it was a good thing and that because of the fact that plaintiff's brother was working in a dangerous place * * * plaintiff herself ought to pay the premium and keep the accident insurance in force"; that thereupon, relying upon the truth of the statements and representations made to her by Catlin, she paid the annual pre-

mium of $5.00; and that when another premium became due, still relying on the representations and statements that had been made her by Catlin, she also paid that. She further alleged that in 1931 the insured was accidentally drowned in the Catawba River, and that she then requested of the defendants that they furnish her the necessary blanks for proof of death in order that she might file her claim under the policy, but was told that it did not cover accidental death from drowning and that she would be paid nothing except the sum of $5.00, which was termed the unearned part of the premium; that the defendants, by false and untrue representations made to her as to the actual terms of the policy, deceived and cheated her and practiced a fraud upon her to her great damage and hurt.

The defendants, answering, admitted that the company had issued to Ben O. Hood a health and accident policy of insurance, but alleged that it was of a limited coverage and did not cover accidental death from drowning. They specifically denied that any such statements or representations as to the terms and coverage of the policy were made to plaintiff by Catlin as claimed by her. They also alleged that the plaintiff had full opportunity to examine the policy and to know its terms, either by reading it herself or having some one read it to her, and having failed and neglected to do so, any hurt or damage that she may have suffered was due entirely to her own fault and not to any act of either defendant. The company also expressly pleaded Section 7994 of the Code of 1932, as showing that the alleged representations set out in the complaint were illegal, if made, and were not such as that defendant could lawfully carry out.

The case was tried before the Hon. T. S. Sease, Circuit Judge, and a jury at the November, 1932, term of Court of Common Pleas for York County. At the proper time counsel for the defendants moved that the plaintiff be required to elect the cause of action on which she would go to trial, it being contended by them that several causes were alleged in

the complaint. Plaintiff's counsel, however, insisted that only one cause of action was stated, an action in tort, founded on fraud and deceit; and the case was tried on that theory. Motions for a nonsuit and for a directed verdict were duly made and refused and the jury found for the plaintiff $10.00 actual and $3,000.00 punitive damages. From judgment entered on the verdict this appeal is taken.

The first question presented for consideration, and which counsel for appellants argue with much earnestness and force, is whether the Court committed error in refusing the defendants' motion for a directed verdict, the several grounds of which, renewed here by exceptions, may be succinctly stated as follows: (1) That it was plaintiff's duty to read the policy or to have it read to her, and that her negligence, as shown by the testimony, in failing to perform that duty precluded a recovery, there being no evidence that any act of the defendants interfered with its discharge by her; (2) that the premiums paid by the plaintiff kept the policy in force and were, therefore, fully earned; (3) that the defendant Catlin was not acting within the scope of his authority at the time he made the alleged fraudulent representations; (4) that the evidence conclusively shows that the defendant company acted in good faith in refusing to pay the plaintiff's alleged claim, and that its payment in the circumstances named was forbidden by the statutory law of the State.

As to the first ground of the motion, the plaintiff testified that she was about fifty-two years of age, and had attended school about four years in all; that she and her mother and her brother Ben were living together in Rock Hill in 1929 and until Ben's death in 1931; that her brother worked for the city at the pump station every day in the week, including Sunday, his hours being from 11 in the morning until 11 at night, while she worked in the Highland Park Mills, her hours being from 7 in the morning until 6 in the afternoon, and that consequently she never saw him except about one hour on Sunday mornings. She further testified that she first def-

initely knew that her brother had insurance with the defendant company about the middle of March, 1930, when a notice of the due date of the premium on the policy came through the mail to their home; that on March 29 she went to the office of the company's agent, the defendant Catlin, to make inquiry about the matter; that she told him that she was a sister of the insured, and "I asked him what kind of policy it was and he told me it was an accident policy, and that it was for $2,500.00, made over to me and he told me that I ought to keep the policy up for my brother Ben worked at a dangerous place out on the river and he told me it covered everything except being in bed and dying"; that believing his statements to be true, and relying upon them, she paid him the annual premium of $5.00 and he gave her a receipt therefor; and that about a year thereafter, still relying upon the truth of his representations, she sent another $5.00 to the agent in payment of another premium then due. She also testified that at the time she made these several payments she did not know where the policy was, or anything about it, but that after the death of her brother, who was drowned on June 13, 1931, the policy was found in his trunk in his room; that he kept the trunk locked, and that she had never gone into it or ever had a chance to do so; and that she had never spoken to her brother about the policy.

In *Baldwin v. Cable Company*, 78 S. C., 419, 59 S. E., 67, 68, the Court, speaking through Mr. Justice Woods, made the following statement: "The rule is a person who is unable to read is bound to have the paper read to him before signing, just as a person who can read is bound to read it before signing; and failure by such illiterate person to take this precaution will ordinarily be regarded such gross negligence as will estop him from avoiding the contract. *Montgomery v. Scott*, 9 S. C., 20, 43, 30 Am. Rep., 1, 9 Cyc., 90. But another rule coexistent with this is, if one of the parties induces the other to sign a paper in reliance upon his representation as to its contents, and the representation turns out to be untrue

and fraudulently made, the party who relied on it is not bound to him who deceived him into signing the paper."

In *J. B. Colt Company v. Britt,* 129 S. C., 226, 123 S. E., 845, 847, the Court had under consideration the question "whether the Circuit Judge erred in holding that the evidence adduced was not sufficient to warrant a finding of fact that the defendant was entitled to avoid the written contract for fraud." The Court, in an opinion by Mr. Justice Marion, said: "That inquiry presents a problem for the solution of which it cannot be said that the law furnishes any satisfactory rule or formula. It involves the logical adjustment upon sound principle or principles of two distinct policies of the law. One is that no person should be permitted to found an enforceable right upon fraud; the other is that the public interests require that commercial transactions be safeguarded, negligence discouraged, and the opportunity for and temptation to perjury minimized, by attaching to a written contract a certain conclusive force or artificial sanctity as the memorial of the transaction it purports to evidence. As an outgrowth of the latter policy, we have the two familiar general rules: (1) That a written contract cannot be varied by parol or extrinsic evidence, and (2) that one cannot avoid a written contract into which he has entered on the ground that he did not attend to its terms, that he did not read the document which he signed, that he supposed it was different in its terms, or that it was a mere form. 13 C. J., 370, § 249. The latter rule obviously rests upon the basic premise that it is a duty owed by every contracting party to the other party and to the public to learn and know the contents of a written contract before he signs and delivers it."

After quoting with approval the rules announced in the *Baldwin case, supra,* this further observation was made: "But there is wide diversity of judicial opinion as to whether the plea of fraud in cases of this character may be soundly met and resisted upon the ground of negligence. 13 C. J.,

372, § 250, and cases cited. Broadly, it may be said that one line of decisions is based upon the theory that negligence is not, and should not in sound morals, constitute a defense to the willful wrong which fraud implies and involves; the other view, upon the theory that neither the Courts of Equity nor of law are bound to afford relief to a victim of fraud who has failed or refused to exercise reasonable diligence or discretion in the protection of his own interests."

In the same opinion it was declared: "If, under the facts of the particular case, the conduct of the party who pleads fraud may soundly be held to have amounted to a reckless or conscious disregard of his duty to avail himself of the opportunity and means at hand to protect his own interests, there would seem to be no valid reason for not applying the principle, recognized in this jurisdiction, that where one is injured by a willful wrong and his own willful or reckless misconduct has contributed to his injury as a proximate cause, he should not be permitted to recover."

And also: "Whether or not reliance upon a representation in a particular case is justifiable or excusable, what constitutes reasonable prudence and diligence with respect to such reliance, and what conduct constitutes a reckless or conscious failure to exercise such prudence, will depend upon the various circumstances involved, such as the form and materiality of the representation, the respective intelligence, experience, age, and mental and physical condition of the parties, the relation and respective knowledge and means of knowledge of the parties, etc. 26 C. J., 1144, § 59."

And finally: "If in the circumstances indicated—parties standing upon an equal footing, absence of any confidential relationship, opportunity and means of investigation at hand, absence of any resort to trick or artifice other than a bald representation that the contract covered everything—one party to a written contract may be permitted to relieve himself of his duty to ascertain the contents of the instrument before signing upon the ground, in substance, that he dele-

gated his duty in that regard to his adversary and relied upon his adversary's verbal representation as to what the contract contained, the law imposing the duty to read before signing, so essential to safeguarding the integrity of written contracts, would be practically nullified."

The contention of the appellants in the case at bar is simply this: That from the time of the alleged fraudulent transaction until the death of her brother, which was more than a year, plaintiff had ample opportunity to read the policy, as it was in the possession of the insured who lived in the same house with her; and that even if a fraud was perpetrated upon her—her testimony for the purpose of the motion being taken as true—no recovery could be had for the reason that "its effect was destroyed by the abundant opportunity to learn the truth."

On cross examination the plaintiff testified:

"Q. What time did you say you paid this first premium on this policy? A. It was the last of March, 1930.

"Q. That was about the first time you knew there was a policy, is that correct? A. Yes, sir.

"Q. When did your brother die? A. He died the 13th of June, 1931.

"Q. During all that time you didn't ask him about the policy? A. No, sir.

"Q. Or discuss with him the fact that there was a policy? A. I never seen my brother but about an hour Sunday morning.

"Q. You didn't talk with him about the policy at all from the time you first knew of it until after his death? A. No, sir."

We think it is unquestionably true that if the beneficiary had inspected the policy—a copy of which is before us—she would have readily seen that it was one of limited coverage, and did not cover death from drowning. There is nothing misleading about it. On its face, printed in large type, are the words, "Travel and Pedestrian Policy," and "This policy

provides benefits for loss of life, limb or sight by accidental means to travelers or pedestrians, subject to the conditions herein stated." The clear language of the coverage is to the effect that should the insured be injured in the manner named, the company would pay for loss of life, both hands, both feet, etc., the sum set opposite such loss, which, in the case of death, would be $2,500.00.

Did the conduct of the plaintiff, in the circumstances recounted, amount to a conscious or reckless disregard of her duty to avail herself of the opportunity and means at hand to protect her own interest? While she was a woman of limited education, it appears that the plaintiff was a person of some intelligence and knew what she wanted. It is true that she did not have the policy in her possession at any time before the death of the insured, but she could have easily obtained it from her brother, who lived with her in the same house, and who had the policy in his possession. She had the fullest opportunity for more than a year to do so, but according to her own statement, she never even spoke to him about the insurance, thereby indicating the greatest indifference to her duty in the matter. In these circumstances, we are constrained to hold that her conduct, in failing to employ the opportunity and means given her to acquaint herself with the contents of the policy, was clearly a conscious and reckless disregard of her duty in the premises and was a proximate cause of her alleged injury or damage.

This case and *Frierson v. Inter-Ocean Casualty Company,* 168 S. C., 178, 167 S. E., 232, are much alike. It is true that in the *Frierson case* the plaintiff, a woman of small education, failed to read either the application or the policy, although she signed the one and later received through the mail the other, which she kept in her possession for six months. In the case at bar, while the plaintiff did not sign the application or have the policy in her possession at any time, she had the fullest opportunity, as we have already

indicated, of acquainting herself with its contents, by merely asking her brother about it. Plaintiff contended in the *Frierson case* that the agent had stated to her that the policy provided for payment of the benefits in case of death "from any cause," and that she relied upon his representations, while it turned out that the policy provided for "accident benefits" only. The Court held, in the circumstances stated, that even if the insurance company practiced the alleged fraud on her, there was no actionable fraud, for the reason she had failed to take advantage of the opportunity given her to inspect the policy and to learn the truth as to its provisions. And we say here that even if the agent in the case at bar made the statement concerning the policy which the plaintiff claims he made, there was no actionable fraud, for the reason that she failed to take advantage of the means afforded her of learning the truth as to what the policy contained. We think, therefore, that the trial Judge should have directed a verdict for the defendants on this ground.

The several other grounds of the motion are without merit. The contention that the defendant Catlin, at the time the alleged fraudulent representations were made, was not acting within the scope of his authority, is disposed of by the case of *Williams v. Insurance Company,* 159 S. C., 301, 156 S. E., 871, and authorities there cited.

The contention that the company, under Section 7994 of the Code of 1932, which provides that no insurance company shall make "any contract of insurance or agreement as to such contract other than as plainly expressed in the policy issued thereon," was estopped to pay plaintiff's alleged claim, is unsound. The action here is not on the contract of insurance, as we have already said, but is one in tort, founded on fraud and deceit. Attention is also called to the statement of the Court in *Crosby v. Insurance Company,* 167 S. C., 255, 166 S. E., 266, 268, that "the statute was never intended to shield a fraud."

Other questions raised by the exceptions are rendered academic by the conclusion reached.

The judgment of the Circuit Court is reversed, and the case remanded, with instructions to enter up judgment for the defendants under Rule 27 of this Court.

MR. CHIEF JUSTICE BLEASE, MESSRS. JUSTICES CARTER and BONHAM and MR. ACTING ASSOCIATE JUSTICE W. C. COTHRAN concur.