15453

BARNES v. INDUSTRIAL LIFE & HEALTH INSURANCE COMPANY OF ATLANTA

(22 S. E. (2d), 1)

*Mr. John T. Roddey,* of Rock Hill, *Mr. W. Clarkson Mc-Dow,* of Atlanta, Georgia, and *Mr. Steele Brice* of Rock Hill, Counsel for Appellant,

*Messrs. Hamilton, Gaston & Hamilton,* of Chester, Counsel for Respondent,

September 25, 1942.

The Opinion of the Court was delivered by MR. ASSOCIATE JUSTICE BAKER, with MESSRS. ASSOCIATE JUSTICES FISHBURNE and STUKES dissenting:

The complaint in this case is apparently patterned on the complaint in the case of Neely against the same defendant, which case was before this Court in 1939, and is reported in 192 S. C., 71, 5 S. E. (2d), 568. But upon a trial of the instant case, the testimony discloses material differences; and in this case the defendant (respondent) timely took the position that it was the plaintiff's (appellant's) duty to read her policy or to have it read to her; that she had full opportunity to do so, and that her failure to perform such duty precluded a recovery.

On October 12, 1936, the respondent issued and delivered its policy of straight life insurance to appellant under the provisions of which the respondent agreed, in consideration of a weekly premium of 15 cents, to pay to the beneficiary named in the policy, upon the death of the insured, the sum of $72.00. The age of appellant was stated in the policy to be fifty-five years; and the policy contained the provision following: "Misstatement of Age. If the age of the insured as stated herein is not correct, then no greater amount shall be paid than the premium hereon would have purchased at

the true age of entry, and if such true age at entry, was over 55 years the Company will not be liable for a greater amount than the premiums paid on this policy, and the beneficiary hereunder shall be bound by the provisions of this clause."

The testimony may be stated briefly: When the contract of insurance was applied for, the agent of respondent who solicited the insurance was informed by appellant that she was 65 years of age, but despite this, her age was stated in the policy written as being 55 years. The appellant did not read her policy, but kept it folded, and paid weekly premiums thereon in the aggregate of $11.70, that is, for seventy-eight weeks at 15 cents per week. In April, 1938, Mr. DuBose, the agent of respondent and the one who collected the weekly premiums, came to the home of appellant and informed her that he would have to take up her policy and return the premiums which had been paid as she was more than 55 years of age at the time the policy was written. Appellant informed Mr. DuBose that he would have to come back that night when her husband would be home. Accordingly, Mr. DuBose accompanied by a man from the home office of respondent (a Mr. Evans) returned to the home of appellant and the subject of procuring a return of the policy and refunding the premiums which had been paid was renewed, resulting in appellant giving up her policy and accepting a refund of the premiums which she had paid. At the time this was done, respondent's agent stated to appellant, "You are too old to carry this policy," to which she replied, "I told you I was sixty-five years old." Respondent's agent then stated, "I can't take the policy, I ain't got no right to take the policy from you, but we will have to get the policy; or, if you keep the policy, we cannot pay any death claim, because the Government won't allow me to pay any death claims on old people at your age." It was also testified that respondent's agent told appellant that "the Governor was applying to give you old pensions; and if I give

them up (referring to the policy), you will get your pension." And that if she didn't give up the policy, no death claim would be paid but only the amount of the premiums refunded, and appellant wouldn't get a pension if it was known she was carrying this insurance.

The appellant surrendered her policy (the one involved in this suit, although retaining others on which she paid the premiums), accepted a check for $11.70, the amount of the premiums which she had paid thereon, and signed a full and complete release to respondent absolving it from "all actions, causes of actions, claims and demands of every kind and character arising under said policy," and acknowledged that she was forever estopped to claim that respondent is liable for anything more whatsoever under said policy. This release was also executed by her husband, the beneficiary named therein. The said check for $11.70 was retained by appellant for a week or more before it was cashed.

The appellant had the policy in her possession for more than eighteen months, and neither read it nor had it read to her. If she had done so, she would have been informed that her age was stated therein as being 55, and that all the respondent was liable for under the terms of the policy was the amount of the premiums paid thereon.

The first complaint made by appellant concerning the surrender of this policy was through her attorney in a letter dated January 19, 1940, in reply to which letter the respondent offered to return the policy, provided the $11.70 was refunded, and permit the appellant to resume the weekly payment of premiums, which offer was refused; but prior to the commencement of this action the sum of $11.70 was tendered respondent.

Following the surrender of the policy in question, the appellant procured another life policy from the Liberty Life Insurance Company in the identical amount, $72.00, the weekly premium on which was 10 cents, which policy was in full force and effect both at the time of the commencement

of this action, and at the time of the trial of this case. So far as the record discloses, the Liberty policy was equally as valuable as the policy issued by respondent.

At the conclusion of appellant's testimony, the respondent moved for a nonsuit upon fourteen grounds, which motion was granted by the trial Judge, but without stating the ground or grounds upon which he granted it, and this appeal followed.

Briefly, the first ground was that there is no proof of actual damages; the first ground was that the policy itself contained the provision that if the true age of the insured was actually over fifty-five years, the company (respondent) would not be liable for a greater amount than the premiums paid on the policy; and the sixth ground was that the uncontradicted testimony was that the insured (the appellant) was over fifty-five years of age when the policy was applied for and issued. We deem it unnecessary to refer to the other grounds.

The exceptions do not conform to the rules of this Court, but we will in this instance waive this lack of conformity and pass upon the appeal.

Conceding, without so deciding that except for the fact that appellant failed to show that she had suffered any actual damages, and the fact that her testimony affirmatively removed any presumption of such damages, even nominal, the appellant would have been entitled to have her case submitted to a jury, still we are of opinion that the order of nonsuit was properly granted. And in reaching this conclusion we are disregarding the adverse factor that the appellant had the policy in her possession for more than eighteen months, and neither read it nor had it read to her.

Even conceding that fraud was practiced upon appellant in procuring a cancellation of the policy, yet, upon this matter being brought to the attention of the officials of respondent, the respondent promptly offered to return the policy to appellant upon a return by her of the premiums which had

been refunded and re-establish the policy in full force and effect waiving the interim premiums, thus repudiating the fraudulent acts of its agents, and offering to restore the *status quo* at the time the facts first were brought to its attention.

Aside from this, the record discloses that the appellant suffered no actual damages; and any presumption of the existence of nominal damages not capable of exact measurement, has been affirmatively dissipated by the procurement by appellant of another policy of insurance in another company in the identical amount, at a smaller weekly premium, and so far as the record discloses this last policy is of equal value with the policy which had been issued to the appellant by the respondent.

The appellant having failed to prove any actual damages, and as aforesaid, any presumption of nominal damages having been overcome or destroyed by affirmative testimony, the appellant failed to establish a cause of action. See *Watson v. Southern Railway Company,* 104 S. C., 204, 88 S. E., 461.

As to whether the question of punitive or exemplary damages should have been submitted to the jury, we quote from *Cook v. Atlantic Coast Line R. R. Co..* 183 S. C., 279, 281, 190 S. E., 923, 924: "Exemplary damages do not and cannot exist as an independent cause of action, but such damages are mere incidents to the cause of action and can never constitute the basis thereof. If the injured party has no cause of action independent of a supposed right to recover exemplary damages, then he has no cause of action at all; consequently, there must be allegations of actual or nominal damages in the pleadings *and a proof thereof in the trial of the cause* in order to support a verdict for punitive damages alone." (Italics added.)

The order appealed from is affirmed.

MR. CHIEF JUSTICE BONHAM and CIRCUIT JUDGE WM. H. GRIMBALL, ACTING ASSOCIATE JUSTICE, concur.

Mr. Associate Justice Fishburne (dissenting) :

After a careful study of the record in this case and the applicable law as reflected in our decided cases, I am of the opinion that the Circuit Court committed error in granting a nonsuit.

The evidence shows that when the policy in question was applied for by the plaintiff (upon the insistent solicitation of the defendant's agent), she stated to him that she was 65 years of age, and too old to obtain insurance. He knew that at this age she was uninsurable, but he assured the plaintiff and her husband that she could secure a policy. This took place: "He run his hand in his pocket. He said, 'Wait; I have got a little book policy.' And he opened his book, and he turned over and looked at something down there, I don't know what it was, or how it was; any way, he said, 'Here is where I can give you a nice policy.' "

A week after the application was made he delivered the policy to her, and he knew that her age was therein misstated as being 55 years. For 78 weeks thereafter he collected from her a weekly premium of 15 cents. At the expiration of that time, in April, 1938, he, together with the office manager of the defendant, visited the home of the plaintiff and notified her that the policy was worthless because when it was issued she was 65 years old.

Nowhere does it appear that these agents charged the plaintiff with having misrepresented her age. The reasonable inference is that the soliciting agent knew all along that the age she gave him when the application was made was correct, and that the company through him deliberately misstated her age in the insurance contract. In order to obtain the surrender of the policy the agents of the defendant not only told the plaintiff that she was uninsurable, but told her that the government would not permit the insurance company to pay her beneficiary in case of her death. And they furthermore informed her that she would not be eligible for an old age pension if it were discovered that she held

this policy. The agent went so far as to guarantee the payment of the old-age pension. The plaintiff testified that she surrendered the policy, "believing that I would get the pension provided I give up the policy."

It may be inferred from the evidence that all of these statements were false and fraudulently made in order to obtain the policy.

I am unable to conclude from a consideration of the evidence in this case and under the decisions of our Court, that the plaintiff must be deemed remediless because for 78 weeks she or her husband, the beneficiary, did not read or have read to them that provision of the policy dealing with "Misstatement of Age."

The plaintiff and her husband, as shown by the most casual reading of the record, were ignorant and illiterate Negroes. The husband, Jessie Barnes, testified that he could not read, but could sometimes spell and scratch his name. And the plaintiff stated, "I can't do much reading, and I can't understand what I read, and I haven't had much schooling." She said further that the agent was well known to her and that she trusted him, and that other members of her family held policies in his company. With reference to having the policy read to her she stated: "If you don't know to do a thing you don't do it." The insurance policy covers five typewritten pages of the record.

The position taken by the insurance company in this case is the same as that assumed by the insurance company in the case of *Thomas v. American Workmen,* 197 S. C., 178, 14 S. E. (2d), 886, 136 A. L. R., 1, that is, that the plaintiff is barred from recovery even though the representations were fraudulently made, by reason of her own negligence and conscious or reckless disregard of her duty, when she neither read the policy herself nor had some one else to read and explain it to her.

The facts in this case and in *Thomas v. American Workmen, supra,* run a parallel course. In each case the insurance

company was dealing with the most ignorant type of policy-holder. In *Thomas v. American Workmen,* the agent when delivering the policy to the insured, fraudulently misread its provisions to her. In the case at bar, it may be inferred that the defendant's agent, with calculated design, misstated the age of the insured and knowingly delivered a policy incorporating that misstatement. His conduct constituted constructive fraud. It is inferable that he had every reason to believe that it would go undetected and undiscovered. We see no appreciable difference between his conduct and the conduct of the agent in *Thomas v. American Workmen,* who deliberately misread the provisions of the policy.

Contracts of insurance are in a somewhat different category from the usual contracts which one encounters in ordinary business transactions. Ordinarily it must be presumed that persons are familiar with the terms of written contracts to which they are parties; and in the absence of fraud they are justly bound by the provisions incorporated therein. But this rule should not be too strictly applied to an insurance policy in cases where the ignorant and unwary are concerned. It is a matter of common knowledge that a very small percentage of literate policyholders are actually cognizant of the provisions of their policies, and many of them are ignorant of the names of the companies issuing the policies. These contracts are prepared by the experts of insurance companies. They are highly technical in their phraseology; they are usually complicated and voluminous, and in their numerous conditions and stipulations furnish what sometimes may be veritable traps for the unwary. The insured, and especially ignorant Negroes obtaining this type of industrial insurance, usually rely implicitly upon the agent securing the insurance. And it is only just and equitable that the company and its agents should be required to deal honestly and fairly with them. The Courts, while zealous to uphold legal contracts, should not sacrifice the spirit of the

law, nor should they be slow to aid the confiding and innocent.

In *Hood v. Life and Casualty Insurance Company of Tennessee,* 173 S. C., 139, 175 S. E., 76, 78, this principle is announced: "Whether or not reliance upon a representation in a particular case is justifiable or excusable, what constitutes reasonable prudence and diligence with respect to such reliance, and what conduct constitutes a reckless or conscious failure to exercise such prudence, will depend upon the various circumstances involved, such as the form and materiality of the representation, the respective intelligence, experience, age, and mental and physical condition of the parties, the relation and respective knowledge and means of knowledge of the parties, etc."

And the foregoing doctrine has been adhered to, and was re-announced in the very recent case of *Thomas v. American Workmen, supra* [197 S. C., 178, 14 S. E. (2d), 887, 136 A. L. R., 1], where it is stated: "But the unmistakable drift is toward the just doctrine that a wrongdoer cannot shield himself from liability by asking the law to condemn the credulity of the ignorant and unwary." See Annotation, 131 A. L. R., 1299, 136 A. L. R., 5.

After reviewing the evidence and applying the principles above adverted to, I am satisfied that the issue of negligence and recklessness should have been submitted to the jury.

I am unable to agree with the view that the plaintiff cannot sustain her action, including punitive damages, because she failed to prove actual damages. After a very thorough review of our cases, it was held, in *Cook v. Atlantic Coast Line R. Co.,* 183 S. C., 279, 190 S. E., 923, that where pleadings allege and evidence shows a conscious and willful violation, intervention, or infringement of legal right, the law should presume damages sufficient to sustain an action, even though such damages may be only nominal, and not capable of exact measurement, and in such case a verdict for punitive damages, without a finding of actual damages, will

be sustained. And see *Jones v. Atlantic Coast Line R. Co.,* 108 S. C., 217, 94 S. E., 490, and *Fields v. Lancaster Cotton Mills,* 77 S. C., 546, 58 S. E., 608, 11 L. R. A. (N. S.), 822, 122 Am. St. Rep., 593.

Although the particular question was not raised in *Cook v. Metropolitan Life Insurance Co.,* 186 S. C., 77, 194 S. E., 636, the Court sustained a verdict for $5.00 nominal damages and $256.00 punitive damages.

It will be noted that the defendant company did not offer to reinstate the policy and permit a resumption of the payment of weekly premiums, until the attorneys for the plaintiff advised it that an action for damages would be brought. If this offer to reinstate constituted an offer of compromise it was not obligatory upon the plaintiff to accept it. If she had a cause of action for fraud and deceit, it could not be impaired by an offer of compromise.

It is suggested that because the plaintiff obtained a policy of insurance from the Liberty Life Insurance Company in the identical amount of $72.00, with a smaller weekly premium, subsequent to the surrender of her policy to the defendant company, that this in effect relieved the defendant company of liability, and eliminates from the case all question of damages. I do not think so. In my opinion, the plaintiff's cause of action relates back to the delict committed by the defendant when under alleged circumstances of fraud it obtained the surrender of her policy. Furthermore, it does not appear with any degree of certainty that the policy obtained from the Liberty Life Insurance Company has any value, because although it is admitted that the plaintiff was 65 years of age, or older, when this latter policy was issued, this policy contains an even more flagrant misstatement of age. It is stated therein that the plaintiff is forty-seven years of age.

In my opinion, the judgment should be reversed, and the case remanded for trial.

MR. ASSOCIATE JUSTICE STUKES concurs.