Jay RODGERS et al., Appellants,

v.

The INSURANCE COMPANY OF the STATE OF PENNSYLVANIA, Appellee.

No. 17519.

Court of Civil Appeals of Texas, Fort Worth.

July 12, 1974.

Rehearing Denied Sept. 13, 1974.

David Ford Hunt, Dallas, for appellants.

Kelsoe & Paternostro, and R. Jack Ayres, Jr., Dallas, for appellee.

## OPINION

BREWSTER, Justice.

This is a suit (1) on a life insurance policy that insured the life of plaintiffs' horse; (2) for damages for fraud that allegedly resulted from false representations of defendant's agent that induced the plaintiffs to accept the policy sued upon;

and (3) for damages for negligence of defendant's agent in issuing plaintiffs the policy sued upon instead of a policy providing a different coverage. The last two causes of action were alleged alternatively. Jay Rodgers and Darrell Davidson are plaintiffs herein and The Insurance Company of the State of Pennsylvania is the defendant. The trial court granted the motion for summary judgment filed herein by defendant and the two plaintiffs have brought this appeal from that decree.

The judgment signed by the trial court recited that the summary judgment decreeing that plaintiffs take nothing by their suit was granted on each and every ground stated in the motion for summary judgment. The motion for summary judgment contained a number of different grounds.

Facts involved in this case that are shown without dispute are that defendant sold and issued to plaintiffs the $10,000.00 life and theft insurance policy that is here sued on covering their horse, Painted Bug.

The undisputed evidence showed that while the insured horse was being led behind another horse that he became frightened and bolted and ran through a barbed wire fence and thereby sustained injuries as are hereinafter described.

Following the injury on August 7, 1972, the plaintiffs hired a veterinary to treat the horse. On August 21, 1972, on instructions from plaintiffs, a veterinary gave the horse an injection that killed him.

Also following the injury, and before the horse was killed, the insurance company hired a veterinary to examine the horse. He would not certify that the horse should be destroyed for humane reasons. He was of the opinion that the horse would live and that his wounds would heal and that upon healing his leg would recover functionally but not 100%. The insurer did not agree to the voluntary destruction of the insured horse.

We affirm the trial court's judgment.

In their third point of error plaintiffs contend that the evidence offered at the summary judgment hearing created fact issues (1) as to whether or not defendant's refusal to give its authorization for the destruction of the insured horse was arbitrary and unreasonable and (2) as to whether or not the horse should have been destroyed for humane reasons because of incurable suffering that it was undergoing as a result of its injuries and that the trial court, therefore, because such fact issues were raised, erred in holding that as a matter of law the plaintiffs are not entitled to recover under the policy for the destruction of the horse because the destruction of the horse under the then existing facts violated the express provisions of the policy.

We overrule this point of error.

The part of the insuring clause in the policy that is material to a discussion of this point reads as follows: " . . . This policy insures against loss by death caused . . . by the intentional and voluntary destruction of insured animal(s) for humane reasons arising out of and solely consequent upon the foregoing named perils (sickness, disease, accident) provided, however, that in the event of such intentional or voluntary destruction, the Company shall have expressly agreed to the destruction of the animal, or a Veterinary Surgeon appointed by the Company shall first have given a certificate that destruction is necessary to terminate incurable suffering, or a certificate is given by a qualified Veterinary Surgeon appointed by the Assured that the suffering is incurable and so excessive that immediate destruction is imperative for humane reasons without waiting for the appointment of a Veterinary Surgeon by the Company."

It was undisputed that the horse was hurt on August 7, 1972; that on August 21, 1972, on instructions from the plaintiffs, a veterinary gave the horse an injection for the purpose of killing the horse and that the injection did kill him; that

the insurer did not agree to this intentional destruction of the horse; and that the veterinary that defendant had appointed did not issue to defendant a certificate to the effect that destruction of the horse was necessary to terminate incurable suffering. The summary judgment evidence also showed, as a matter of law, that no veterinary surgeon appointed by the assured issued a certificate, prior to destruction of the horse, certifying that the horse's suffering was incurable and so excessive that immediate destruction was imperative for humane reasons without waiting for the appointment of a veterinary surgeon by the Company.

▇▇▇▇ The law is that a clause such as that referred to above requiring the insurance company's consent or agreement to the intentional and voluntary destruction of the animal before it is so destroyed grants the insurance company the discretionary right to decide whether to either give consent or to withhold consent to the voluntary destruction of the animal. The rule is, however, that the insurer cannot arbitrarily withhold the granting of its consent to have the animal destroyed. The question of whether consent to destroy the insured animal is arbitrarily withheld is one to be determined from the facts of each particular case. See Stucker v. Hartford Accident & Indemnity Co., 222 Ark. 268, 258 S.W.2d 544 (1953); Wilson v. Hartford Livestock Ins. Co., 193 F.2d 752 (5th Cir., 1952); Marsh v. Ashby, 381 S. W.2d 628 (Ky.Ct. of App., 1964); Butler v. Hartford Live Stock Insurance Company, 261 Minn. 293, 112 N.W.2d 50 (1961), and Ross v. Hartford Fire Insurance Company, 372 Mich. 407, 126 N.W.2d 709 (1964).

The insuring clause, above set out, provides that at least one of three conditions must be present before the policy provides insurance coverage for the death of the horse when caused by its intentional or voluntary destruction. The undisputed evidence at the summary judgment hearing shows that none of those three conditions had occurred in this case before the horse was destroyed under orders from plaintiffs.

When the rule of law referred to just above is applied to the facts of this case, it is apparent that the only remaining question for this Court to decide in passing on plaintiffs' third point of error is whether the evidence presented at the summary judgment hearing shows, as a matter of law, that the insurer here did not act arbitrarily in refusing to give its consent to the voluntary destruction of the horse. Otherwise, under the express wording of the policy, the loss here involved is not covered by the policy that was issued to plaintiffs.

We will here set out the evidence relating to the question.

The plaintiff, Jay Rodgers, testified on deposition that he had been in the horse business for many years; he was part owner of the horse; he saw the horse once after it was hurt; this was four days after the injury; its stitches had then pulled loose; the injury, he said, had laid the horse's front end wide open; the horse appeared to him to be in pain; his opinion was that the horse should be put to sleep; he knew that the insurance company had not consented to the voluntary destruction of the horse at the time he and the other plaintiff, Davidson, instructed a veterinary, Dr. Dwight Gailey, to put the horse to sleep. He also testified that he had insured a $10,000.00 horse and ended up, after the horse was hurt, with a $30.00 horse.

The plaintiff, Darrell Davidson, testified by deposition that he had also been in the horse business a long time and owned an interest in the horse; that the horse had sustained a massive wound to the chest and its right forearm muscle was torn out to where it hung out and down; he had Dr. Coleman, a veterinary, sew him up and

they immobilized the horse; his stitches pulled out and he thought the horse got worse; and twelve days after the horse was hurt he and Rodgers told a veterinary to put the horse to sleep because he felt it would be inhuman to keep it alive further.

Dr. David Coleman, a veterinary, testified by deposition that he was the first to treat the horse for plaintiffs on the day it was hurt; its injury was the extensor muscle of the right foreleg had been severed clear to the bone and stripped down the leg eight inches; some bone covering was stripped; this was its main injury and it had several smaller lacerations; he put the muscle in place and sutured the wound; his first opinion was that the horse could go either way and that there was a good possibility that the horse would be crippled if it lived; he testified that the wounds probably would not have killed the horse but that it would have a weak limb if it lived; when he first saw the horse he did not think the wounds were life threatening; he did not then think the horse should be killed and that is why he tried to treat it; the defendant's adjuster asked him what veterinary he could get to examine the horse for it and it was Dr. Coleman that recommended Dr. Redman to the insurer; his opinion is that the horse could have been saved; that the wound would have healed to where it would have been dry and that the horse would have had no pains from the wound except on motion; and that such pain would not be incessant.

Dr. Dwight Gailey, a veterinary, testified by deposition that he was a partner of Dr. Coleman's; that he saw the horse twice; the wound laid the right forearm open; he did not think that the horse would die from its wound; it would not regain full functional use of its leg but the wound would heal and leave a blemish from scar tissue; when Davidson told him he wanted the horse put to sleep he asked Davidson if he was sure that that was what he wanted to do and when Davidson told him he was sure of it, he then destroyed it by injection at plaintiffs' request; at that time he saw no indication that the horse was suffering from a life threatening condition; on the day the horse was killed it was still limping badly, the wound had not healed, the cut was to the bone, the shoulder muscle was then hanging free, the horse was suffering some, but it was his opinion that the horse's wound would have healed over.

Dr. Vannis Redman, Jr., a veterinary, testified by deposition that defendant's insurance adjuster asked him to look at the horse to see if it should be put to sleep; he saw it first on August 10, 1972; a good job had previously been done by Dr. Coleman in stitching the wound which was on the right front foreleg five inches below the elbow and the cut was nine inches long; his opinion was that the horse would recover from its wound, would get free from pain, would later lead an otherwise normal life, except that it would not recover a high functional use of the injured leg; he saw the horse later after its stitches had pulled loose but his opinion had not changed; the horse was then eating and appeared to him in better condition than before; he has seen horses with wounds as serious as these recover and regain high performance; he said in his opinion this horse was not in pain on August 16, 1972, and his opinion was that there was no justification for killing this horse.

In discussing the questions involved here the court in Wilson v. Hartford Livestock Ins. Co., 193 F.2d 752 (5th Cir., 1952) said the following: "On the other hand, we can not uphold the contention of the appellant which implies that a dispute as to the existence of humane consideration for the voluntary destruction of an animal affords a proper basis for a finding of fact and law that a refusal to grant consent is arbitrary or unreasonable . . . we find in the language of the policy no basis for holding that the insurer subjected itself to liability in case a jury should find it

made a mistake in judgment in evaluating and determining 'humane consideration.' The existence of such consideration necessarily involves to a high degree the exercise of judgment upon a matter as to which reasonable minds might well differ.

" . . . The facts of the case would not authorize a jury to hold that the insurer acted arbitrarily in withholding its consent. The insurer proceeded to investigate through its managing agent and disinterested veterinarians the extent of the injury to the horse. There was ground for, and the existence of, a bona fide dispute as to whether voluntary destruction of the horse was required by 'humane consideration.' "

That court held that a directed verdict for the insurer was proper in that case under those facts.

The Michigan Supreme Court in Ross v. Hartford Fire Insurance Company, 372 Mich. 407, 126 N.W.2d 709 (1964) followed the holding in the Wilson case, supra.

In the case of Stucker v. Hartford Accident & Indemnity Co., 222 Ark. 268, 258 S.W.2d 544 (1953) the court said in speaking of a similar policy provision: "It could have become liable by giving its consent to the destruction; but after getting the information about the happening of the injury, it refused to give such consent. The company had a right to ask for all available information so it could intelligently exercise its discretion in giving or withholding consent to destroy the animal.

" . . . Here the company had the discretion of consenting to the destruction of the animal or refusing such consent, . . . ."

■ We hold that the evidence presented at the summary judgment hearing, which is above set out, shows, as a matter of law, that the insurer did not act arbitrarily in withholding its consent to the voluntary destruction of the insured horse upon the occasion in question.

Another case supporting this holding is Abraham v. Insurance Co. of North America, 117 Vt. 75, 84 A.2d 670 (1951).

In their 6th point of error plaintiffs contend that the court erred in holding that as a matter of law no fact issues are present on the phase of plaintiffs' case that is based on fraud in the inducement to purchase.

We overrule that point.

One of plaintiffs' contentions in the case was that the injury sustained by the insured horse did in all events render him valueless to plaintiffs for the purposes of racing, showing and as a stud. They claimed this to be true regardless of whether the horse died from his injuries and regardless of whether he should be put to death for humane reasons.

On this phase of the case the plaintiffs pleaded in substance that defendant's agent *represented to them that the policy issued to plaintiffs would fully protect them against loss of the horse for show and/or for pleasure and/or racing purposes.* They pleaded that they were induced by these false representations to accept and pay for the contract of insurance that is here sued on. They pleaded that the horse later sustained massive injuries that rendered him worthless for the purposes of racing, show or pleasure, and that when plaintiffs filed a claim for their loss under the policy that defendant denied any liability for the loss because they claimed that the coverage afforded by the policy did not include coverage for the particular type loss the plaintiffs had sustained. Plaintiffs pleaded that by reason of such fraud they were damaged in the amount of the policy plus an additional $10,000.00 as punitive damages.

The summary judgment evidence showed that one Chervenak, defendant's agent, was the man that sold the policy to plaintiffs and that plaintiff, Rodgers, talked to Cher-

venak and was the only man to whom defendant's agent made any representations.

Rodgers' deposition testimony, relating to this issue, was in substance that he told Chervenak that he had some partners in the ownership of the horse; that he had basically never insured a horse before; that his partners were investors, and not horsemen, and that he wanted insurance to protect their interest in the horse; that they planned to use the horse for racing, showing and as a stud; that Chervenak then told him, "I can take care of it and this will protect your interest and this is what you need"; that he relied wholly on Chervenak to get him the type of insurance he needed; Chervenak never told him the policy would cover anything other than death; they never discussed what it covered; he told Chervenak they had invested a bunch of money in the horse and that they wanted the investment insured and Chervenak told him that that was what he was doing; Chervenak said Rodgers' investors were protected by the policy; they never discussed what losses the policy was to cover; Chervenak simply told him he was protecting the investment in the horse; *the misrepresentation that he claims Chervenak made to him was that their investment was protected by the policy.*

We hold that the trial court was correct in granting the motion for summary judgment as to the part of plaintiffs' case wherein they alleged fraud in the inducement.

This is true because, as a matter of law, the representations that Rodgers testified were actually made to him by Chervenak, as set out above, will not support an action for fraud.

■ One of the essential elements of a fraud action is that the defendant or his agent must have made to plaintiff a misrepresentation as to a material fact. 25

Tex.Jur.2d 626, Fraud and Deceit, Sec. 13, and Rumfield v. Rumfield, 324 S.W.2d 304 (Amarillo Tex.Civ.App., 1959, ref., n.r.e.).

■ Chervenak's statement that the policy in question would protect Rodgers and his co-investors in the horse was an expression of an opinion.

An expression of an opinion, such as that involved here, by defendant's agent does not constitute actionable fraud. The following cases are authority for this holding: Sherwin-Williams Co. v. St. Paul-Mercury Indem. Co., 97 Ga.App. 298, 102 S.E.2d 919 (1958); Fields v. Fire & Casualty Ins. Co. of Connecticut, 101 Ga.App. 561, 114 S.E.2d 540 (1960); Hart v. Waldo, 117 Ga. 590, 43 S.E. 998 (1903) and Donoho v. Equitable Life Assur. Soc., 22 Tex.Civ.App. 192, 54 S.W. 645 (1899).

In addition to what we have said the record here shows that the policy sued on was issued by defendant to the plaintiffs on November 19, 1971. The insured horse was not injured until August 7, 1972. The language of the policy was clear and unambiguous. The policy clearly states that it only provided life insurance on the horse and theft insurance in the event the horse was stolen. Anyone that can read, on reading the policy, can easily tell that.

■ An insured has the duty to read his policy on receiving it and he will be charged in law with knowledge of its conditions and coverage when he has had the policy as long as plaintiffs here held it without complaint. A case of actionable fraud does not exist under facts such as those involved here where the insured has a chance to inspect the policy and thus learn the truth as to its coverage and to complain if the coverage desired was not afforded. Here the plaintiffs received and held the policy without complaint as to its coverage for over eight (8) months before the loss occurred. See Hart v. Waldo, supra; Hood v. Life & Casualty Ins. Co.,

173 S.C. 139, 175 S.E. 76 (1934), and Dallas Joint Stock Land Bank of Dallas v. Harrison, 138 Tex. 84, 156 S.W.2d 963 (Syl. 4) (1941).

In their 7th point of error the plaintiffs contend that the trial court erred in holding as a matter of law that the plaintiffs did not have a cause of action against defendant for negligence under the record in this case.

We overrule that point.

Plaintiffs' pleadings were in effect that defendant's agent was negligent in failing to issue a policy to plaintiffs providing coverage for the type of loss that occurred to the insured horse upon the occasion in question. The facts bearing on the question are set out in our discussion of plaintiffs' 6th point of error.

We hold that as a matter of law the undisputed evidence offered at the summary judgment hearing shows that plaintiffs did not have a cause of action against defendant for negligence.

■ Our disposition of plaintiffs' points 3, 6 and 7, as heretofore indicated, controls the disposition of this appeal. We have there held that the trial court correctly granted the defendant's motion for summary judgment on each of the grounds therein discussed. If we are correct in that holding, then even if the court erred in granting the summary judgment on one or more of the other grounds urged in the motion it would matter not. Such error, if any, would be harmless. See Hudson v. Buddie's Super Markets, Inc., 488 S.W.2d 143 (Fort Worth Tex.Civ.App., 1972, no writ hist.).

■ In plaintiffs' 4th point of error they contend that the trial court erred in holding that as a matter of law the plaintiffs failed to use all reasonable means to save the life of the insured animal because there was a fact issue on that.

In their 5th point of error they contend that the trial court erred in holding that as a matter of law plaintiff violated the policy provisions regarding fraud by claimant in representing that the destruction of the animal was necessary for humane reasons because there was an issue of fact on that.

We sustain plaintiffs' 4th and 5th points of error because we believe the record shows fact issues exist as to the matters involved there. These two errors are harmless for the reasons stated.

The plaintiffs' 1st, 2nd, 8th, 9th and 11th points of error are very general and are of the scatter-barrel type. The whole case can be argued under any one of them. For example, the point No. 1 is that the court erred in granting the motion for summary judgment, and point No. 2 is that the court erred in granting the motion for summary judgment on each and every ground stated therein, and so on. What we have heretofore said disposes of those points. At any rate, we hereby overrule plaintiffs' points of error Nos. 1, 2, 8, 9 and 11.

Plaintiffs' 10th point of error states that the court erred in holding, as a matter of law, that defendant tendered back to plaintiffs the premium paid for the policy. We have not been directed to a place in the record where the trial court made such a holding and, after searching the record ourselves, we cannot find a place where it shows that the trial court made such a holding. The point is therefore overruled.

The judgment is affirmed.