13060

WILLIAMS v. COMMERCIAL CASUALTY INS. CO.

(156 S. E., 871)

February, 1930.

*Messrs. McDonald, Macaulay & McDonald,* for appellant,

*Messrs. Gaston, Hamilton & Gaston,* for respondent,

February 2, 1931.

The opinion of the Court was delivered by MR. JUSTICE STABLER.

This is an action for damages for alleged fraud and deceit in connection with the sale and delivery of a specimen or sample policy of life, health, and accident insurance to the plaintiff by one J. S. Orr, agent of the defendant company. At the trial of the case, the defendant by its answer having offered to allow judgment in favor of the plaintiff for actual damages, it was agreed that such damages amounted to $30, and that a verdict therefor should be rendered for the plaintiff. Defendant's counsel made motions for a nonsuit and for a directed verdict as to punitive damages, which motions

were overruled, and the jury found for the plaintiff $1,000. A motion for a new trial was made and refused. Defendant appeals.

It is not denied that a fraud was perpetrated upon the plaintiff, but the appellant contends that Orr was not acting within the scope of his authority as its agent in committing the fraudulent acts; and the appeal, as stated by its counsel, rests upon the decision of that point.

Testimony for the plaintiff tends to show that about the middle of August, 1928, Orr went to see the plaintiff about buying an insurance policy, displayed his license, explained certain provisions of the proposed policy, and told him that the premium would be $2.65 a month; that after some conversation, plaintiff, who could neither read nor write, agreed to take the insurance, and paid Orr the first monthly premium, and that Orr entered the payment on a policy collection register which he had with him; that about two weeks later Orr collected another month's premium, delivered to plaintiff a paper purporting to be the policy sold him, some sick blanks, and a premium receipt book, and entered on the book the two premium payments already made; that in October or November plaintiff was ill for several weeks; that he sent a sick blank to his attending physician to be filled out; that the doctor filled it out and delivered it to plaintiff's son, who delivered it to Orr, who told plaintiff's son that he had sent it off; and that no sick benefit under the policy was ever paid to plaintiff.

The policy, the premium receipt book, and the policy collection register were placed in evidence. At the end of the policy are found these words: "In Witness Whereof, The Commercial Casualty Insurance Company, of Newark, N. J., has cause this policy to be signed by its President and Secretary and countersigned by a duly authorized Representative of the Company." It was not signed by the president or secretary, but bears the signature of "J. S. Orr, Authorized Representative," and the company's seal. The words

"sample copy" had been printed in capital letters at the foot of the policy, but the word "sample" had been erased, and in the same space there had been written "1928 Cereal," the legend thus being changed from "sample copy" to "1928 Cereal copy."

The policy collection register contains "a number of names, the numbers of certain policies, the premiums thereon, the dates of policies, the monthly indemnity and the amount of the principal sum," the second name on the book being "James Williams, address, Chester, S. C., premium $2.75, monthly indemnity $40.00, principal sum $500.00, and premium due August." Through this name and address and the amount of premium a line has been drawn, and no policy number is indicated or date given. Among other names is that of Robert Foster, and there was testimony tending to show that Orr made this entry. The register also contains instructions as to the collection of premiums, the steps to be taken for reinstatement of a lapsed policy, the filing of monthly reports of collections, etc., and, *inter alia,* the statement: "The book is to be used by you to enter premiums as they are collected thereby enabling you to keep your records in proper order."

The premium receipt book contains, among others, this provision: "Until otherwise (scratched out) this office, you will pay these premiums to the Collector named herein, or at the Home Office. *If paid to another, you do so at your own risk.*" This book names the plaintiff as the insured and J. S. Orr as the collector, and contains this sentence: "Next Premium must be paid on or before September 1st, 1928, and on or before the 1st day of each month thereafter, to the above named Collector."

The defendant's state manager, A. H. Sawyer, admitted in his testimony that the company furnished Orr with sample policies to be used for advertising purposes, but stated that it had never authorized the sale or delivery of any such policy or the collection of any premiums thereon. He testified also

that defendant's policies are issued through him from the Columbia office, that he had never received any application or premium for a policy on James Williams, had never issued any such policy, and had never received any claim for sick benefits for the plaintiff, and that the first notice that the defendant had of any claim under the policy was the service upon it of the summons and complaint. He testified further that the premium receipt book placed in evidence was furnished to Orr by the defendant for advertising purposes and that it contained the word "specimen" or "sample," which had been erased; that Orr was to get as his remuneration the full amount of the first month's premium and 25 per cent. of subsequent premiums; and that he sent the policy collection register to Orr to assist him in keeping his records, but instructed him not to collect premiums, although admitting, on cross-examination, that the premium receipt book authorizied him to collect premiums.

As to the facts there is little dispute. Can it be said, as a matter of law, that the acts done by Orr were outside the scope of his agency, admitted or inferable from the testimony?

Ordinarily, the question whether a given act was or was not such as to be within the agent's scope of authority is one for determination by the jury. 18 R. C. L., 254; *Polatty v. Railway,* 67 S. C., 391, 45 S. E., 932, 100 Am. St. Rep., 750; *Redding v. Railway Co.,* 3 S. C., 1, 16 Am. Rep., 681.

The appellant contends that it never authorized Orr to sell or deliver a "bogus" policy to the plaintiff, and that is no doubt true, but that is not the test. The principal is responsible in punitive damages for the fraudulent acts of his agent done in the course of his employment, even when they may have been performed *contrary to the express directions of the principal. Brown v. Telephone Co.,* 82 S. C., 173, 63 S. E., 744, and cases cited. We can do no better in this connection than to quote the following from

*Reynolds v. Witte,* 13 S. C., 5, 36 Am. Rep., 678, which seems to be the leading case on the point in this State: "What is the proper understanding of the phrase 'within the scope of the agency?' Does 'the scope' include negligence and exclude fraud? *It cannot properly be restricted to what the parties intended in the creation of the agency,* for that would also exclude negligence, as no agent is appointed for the purpose of being negligent, any more than for the purpose of acting fraudulently. *The question cannot be determined by the authority intended to be conferred by the. principal. We must distinguish between the authority to commit a fraudulent act and the authority to transact the business in the course of which the fraudulent act was committed.* Tested by reference to the intention of the principal, neither negligence nor fraud is within 'the scope' of the agency; but tested by the connection of the act with the property and business of the agency, fraud in taking the very property is as much 'within the scope of the agency' as negligence in allowing others to take it. *The proper inquiry is, whether the act was done in the course of the agency and by virtue of the authority as agent.* If it was, then the principal is responsible, whether the act was merely negligent or fraudulent. Here the fraudulent act was the appropriation of the very property of the agency—without which agency they would not have had possession of the property and could not have done the act." (Italics added.)

Did the defendant give to Orr "the authority to transact the business in the course of which the fraudulent act was committed"? It is admitted that Orr was an authorized agent of the company, licensed by the state insurance department, with authority to solicit insurance, write applications, and deliver policies, and there was ample testimony to support an inference by the jury that he was authorized to collect premiums. He went to see the plaintiff, took his application for insurance, collected two months' premiums and delivered him a "policy." Assuming—as we

must, in connection with motions of this kind—that the jury took the view most unfavorable to the appellant in so far as the authority to collect premiums was concerned, we find that the only act which Orr did which was not expressly authorized by the appellant was the delivery of a "bogus" policy instead of a genuine policy, and we cannot say, as a matter of law, that in doing such act he turned aside from his principal's business and entered upon business exclusively his own. Except for the authority given him by the appellant, he would not have been in position to perpetrate the fraud, every act of which was in that class of acts which he had been employed by the company to perform. We think the appellant got all it was entitled to when the question of the scope of Orr's agency was submitted to the jury.

In *Medlin v. Railway Co.*, 143 S. C., 91, 141 S. E., 185, 56 A. L. R., 767, plaintiff's contentions—found by the jury to be true—were that he asked the train conductor the amount of the fare and was correctly informed as to such amount, that he gave the conductor a $20 bill to pay the fare, but that the conductor failed to return him the change, $13.04, appropriating the same to his own use. Though it was not shown that the railroad company knew anything about the transaction or condoned it or received any profit from it, the Court held that the conductor, being authorized to collect the correct fare, was acting in the scope of his agency, in the entire transaction. In that case, as in the case at bar, the agent was able to commit the fraud only through the use of the instrumentalities and powers placed in his hands by the principal.

In the *Reynolds case, supra,* the following is quoted with approval from Lord C. J. Holt: "Seeing * * * that some one must be loser by the deceit, it is more reasonable that he who employs and confides in the deceiver, should be the loser than a stranger."

And from Story on Agency: "It is a general doctrine of law that, although the principal is not ordinarily liable (for

he sometimes is) in a criminal suit for the acts or misdeeds of his agent, unless, indeed, he has authorized or co-operated in them, yet he is held liable to third persons in a civil suit for the frauds, deceits, concealments, misrepresentations, negligences and other malfeasances, misfeasances and omissions of duty of his agent, in the course of his employment, although the principal did not authorize or justify or participate in, or indeed know of such misconduct, or even if he forbade the acts or disapproved of them. In all such cases the rule applies *respondeat superior;* and it is founded upon public policy and convenience, for in no other way could there be any safety to third persons in their dealings, either directly with the principal or indirectly with him, through the instrumentality of agents. In every such case the principal holds out his agent as competent and fit to be trusted, and thereby, in effect, he warrants his fidelity and good conduct in all matters within the scope of the agency."

Nor does the fact that the appellant did not profit from its agent's fraud avail it. It is very clear that in the *Reynolds case, supra,* which was submitted to the Court upon a comprehensive statement of fact, the principal obtained no benefits from his agent's fraud, but on the contrary suffered detriment. This question is well discussed in *Mick v. Corporation of Royal Exch. Assur.,* 87 N. J., Law, 607, 91 A., 102, 104, 52 L. R. A. (N. S.), 1074, in which the Court said:

"Naturally, when an agent intrusted with powers to deal with a particular subject-matter misuses those powers so as to deal unlawfully, and the principal is sought to be held responsible, the plea is that the powers are exceeded, and the unlawful acts are not within the scope of the agency. But, as was said by Mr. Justice Willes in the leading case of *Barwick v. English Joint Stock Bank,* L. R., 2 Exch., 259; 36 L. J. Exch., 147, 12 E. R. C., 298:

" 'In all these cases it may be said, as it was said here, that the Master had not authorized the particular act, but he

has placed the agent in his place to do that class of acts, and he must be answerable for the manner in which that agent has conducted himself in doing the business which it was the act of his master to place him in.'

"That case was quite generally considered to limit the responsibility of the principal for fraudulent acts of the agent to those committed for the benefit of the principal; but this misapprehension is set right by the House of Lords in the recent case of *Lloyd v. Grace, Smith & Co.*, 1912 A. C., 716, where a solicitor was held accountable for the fraudulent procurement of a transfer of property from a client by the solicitor's managing clerk, though the solicitor in no way benefited or could benefit thereby, knowing nothing of the transaction. The rule is laid down that, irrespective of the question of benefit, the principal is liable for the fraud of the agent acting within the scope of his authority."

The judgment of the Circuit Court is affirmed.

MR. CHIEF JUSTICE BLEASE and MR. JUSTICE CARTER concur.

MR. JUSTICE COTHRAN dissents.