16566

SHUMPERT v. SERVICE LIFE & HEALTH INS. CO.

(68 S. E. (2d) 340)

*Messrs. Robinson, Robinson & Dreher,* of Columbia, *for Appellant,*

*Messrs. N. Welch Morrisette, Jr., Roy V. Lind* and *Preston H. Callison,* all of Columbia, *for Respondent,*

November 30, 1951.

Stukes, Justice.

Respondent recovered verdict and judgment for actual and punitive damages against appellant upon a cause of action for fraud and deceit in the issuance of insurance. There were two policies, one of which was upon the life of respondent in the sum of $250.00 with his wife, Martie, as the beneficiary. It was so recited on the outside of the policy but it was described as a "Family Protective Policy." The other is described in the record as a hospitalization, surgery, accidental death, and dismemberment policy, which recites a group policy issued to South Carolina Farm Bureau as an individual or as the head of the family, and all of the named members of the family were referred to as insured. The wife of respondent was listed. There was but one application which will be dealt with in more detail hereinafter because its nature and the transaction of the solicitation and procurement of it distinguish the case and materially support respondent's contention of fraud and deception.

He testified that in November 1948 he was approached at his work by Mr. Rish and Mr. Holliday who said that they were representing the appellant company and solicited him to take a policy. He told them that he was not much interested in one on himself but would like to have a policy upon his wife who was sick. He was told by the agents that they would write a joint policy which would cover both. Respondent told the agents that he did not know whether his

wife could be insured because she had cancer, and the agents told him that would make no difference because he was a Farm Bureau member and the insurance was to protect Bureau members who were poor and they could get a policy in their company. Respondent delayed decision although he was assured by the agents that it would help him to take care of medical bills and funeral expenses and assist in taking care of his children; that it made no difference what respondent or his wife should have, whether, quoting from the record, "T. B., cancer or anything". The agents explained that the joint policy over respondent and wife, which they recommended, would pay either survivor $1,000.00, and $250.00 would be paid immediately for burial expenses and the balance of $750.00 later. Something like a check would be attached to the policy which would be paid upon death and it could be taken for that purpose to the insurer's office or to an undertaker. Respondent saw agent Rish in January 1949 at Pelion and in the meantime agent Holliday had visited respondent's home and missed him. At the meeting in Pelion, Rish explained the policy again and said particularly that in case of the wife's death the insurance would, quoting again from the testimony, "help out with the burial, and taking care of the children, and the funeral expenses and all"; and the agent repeated the assurance that it covered all kinds of sicknesses, even "T. B." or cancer, and would pay the burial expenses in either case.

At this January interview with Rish the latter filled out an application and respondent signed it. When asked on the stand what he was told the *premium* would be, respondent answered: "* * * $250.00 burial premium and $750.00 after burial," showing that he did not know the meaning of the word "premium", which demonstrated his ignorance. Further questioned, he said that the cost would be $21.41 for six months. Respondent further testified that he was told that the application which he signed was, quoting, "some kind of a paper connected with the policy, showing that I had paid for the policy."

The application, which was introduced in evidence, is a cryptic document, which the trial judge later remarked on motion for new trial was unintelligible to him. In a column captioned vertically "Amount of life," opposite respondent's name entered horizontally at the left, are the figures 250 and blank opposite the name of his wife. However, the very next of the nine columns is entitled, "A. D. & D." and entered opposite each of the names of respondent and his wife are the figures 1000. The application was entitled "Application for Insurance", which served for the issuance of both policies; and in it the name of repondent's wife appeared as conspicuously as his, both under the following caption above them: "Member (Beneficiary or other insured)." Extended to the right, opposite each name, are the nine columns of information with all of the eighteen blanks appropriately filled except the seventh column (amount of life) which was left blank with respect to the wife, but in the next, eighth, column, headed vertically "A. D. & A.", the figures 1,000 were inserted opposite the names of respondent and his wife. Presumably, copies of the application accompanied both policies. Sec. 7988, 1948 Code Supp.

Respondent said that he did not read the application because he could not read to amount to anything although Rish told him he should read it, whereupon Rish read it to him, which respondent said he thought was a proper reading because he had confidence in Rish. The first semi-annual premium of $21.41 was paid and Rish gave him a receipt dated Jan. 28, 1949, which recited that it was accepted subject to the approval of the Home Office and to the conditions of the policy, and said that a policy would be forthcoming in a week or ten days; and the two policies were received by mail in about that time. Respondent kept them in the envelopes in which they came. He did not ask his wife to read the policies to him because he did not want to worry her or embarras her with the information that he had bought insurance to cover the expenses of her burial; and his children, who were in school, were not asked because, quoting, "I took it

for granted that what Mr. Holliday and Mr. Rish told me was O. K. and I didn't ask them (the children) to read them. I just took them and put them up." His wife became bedridden from her affliction in June before her death in November, suffered pain and took drugs, including morphine, for a year or year and a half.

On cross-examination respondent said that he practically finished the third grade in school, having attended about five, six or seven years of three to four months each year, but he was sick and at home a part of the time and left school at about seventeen or eighteen years of age to help his father who, in bad health, ran a gin and grist mill. He has signed some legal papers but usually had someone with him who read them to him. He would not have bought the policies if he had known that the agents' statements about them were untrue, but he believed the agents to be good and honest men.

Upon the death of respondent's wife he went to see Rish in Pelion and told him of it. Rish assured him that he need only go to the insurer's office in Columbia and the policy would be paid. This advice was followed but the young lady in the office examined the policies and told him that he had only accident insurance on his wife, which respondent denied and told her that he bought only a life insurance policy. This was the first mention to respondent of an accident policy. He went back to Rish and asked him to go to the insurer's office and help him. Rish said there was nothing he could do and thereupon became speechless. Respondent is a sharecrop farmer without any other business experience and can do very little reading, not enough to understand anything like an insurance policy or a business letter. From the witness stand he identified in the courthouse Mr. Rish and Mr. Holliday. The latter did most of the talking when they came to respondent's home on the first occasion. When Mr. Holliday came alone after the first solicitation, respondent was not at home and Holliday talked to his wife and daughter. The agent Rish and respondent were life-long acquaintances. Rish was a director of the Farm Bureau and a teacher in a

veterans' school. Respondent did not want to buy hospital insurance for his wife because he had no hospital expenses on her account. The Cancer Clinic provided hospital treatment.

Respondent's son, who did not live with him and who was a veteran and attended the school at which Rish taught, testified that in September 1950 when giving him change to take to his father from the last premium payment, after inquiry about his mother, Rish told him that the insurance on his mother was all right. This son was with respondent when he went to see Rish after his wife's death and Rish directed him to go to the Columbia office of the insurer and said that the policy would be paid there; but at the office they were told by the lady whom they saw that the policy was no good and there was nothing that could be done about it. They went back to Rish who became pale, nervous and would not talk to them. A cigar trembled in his hand.

The married daughter of respondent who lived in North Carolina testified that she was at her parents' home in December 1948, when agent Holliday called and inquired whether her father had decided to buy the policy. Her father was not at home and her mother talked with the agent and asked whether the latter knew that she had cancer. He assured her that so long as her husband was a member of the Farm Bureau the policy would be sound despite her condition and in case of her death, the proceeds of it would be needed. The witness repeated the foregoing conversation to her father, the respondent, upon his return later in the day, which was before he applied for the policy. This witness paid the last premium on the policy, $21.71, which was given her by her mother from under her pillow, to agent Rish and the receipt, dated Sept. 15, 1949, was offered in evidence.

A disinterested witness testified that he overheard the conversation between respondent and Rish, after the death of the insured, in which Rish assured the respondent that the policy would be paid upon presentation at the Columbia office, and this witness went with respondent and his son

to Columbia on their futile mission to collect the proceeds of the policy.

For appellant, agent Holliday testified that he never saw respondent or his daughter prior to the trial, and did not know agent Rish before but had probably seen him. The witness went regularly over the State to Farm Bureau meetings at which he spoke to large crowds and explained the insurance. There was such a meeting in the Lexington high school auditorium during the fall of 1948. On cross-examination the witness qualified his denials by saying that he did not remember that he ever called at respondent's home, as testified to by the latter's daughter. The witness has, been promoted by appellant to sales manager. Maintenance of the insurance is dependent upon continued membership in the Farm Bureau. There were in 1948 in Lexington County from one thousand to eleven hundred members. The witness would not write insurance on any one who was known to have incurable cancer because appellant would not issue it. On re-direct examination the witness said that he had never been with agent Rish to see respondent.

Rish testified that he had been a director of the Lexington County Farm Bureau and that he solicited respondent for insurance on Jan. 20, 1949, and was accompanied by another of appellant's agents, one Bass, who explained the provisions of the policy to respondent and the witness heard no discussion of cancer. In Pelion eight days later the witness took respondent's application and filled it according to the information given him by respondent who signed it. Respondent applied for life insurance only upon himself, not his wife. The witness said that he collected the second premium on Sept. 15, 1949, from respondent's wife who was sitting in a chair in her home. The witness has known respondent since youth but had no prior business dealings with him. The policy in suit was the first sold by the witness and he is not now an agent. In soliciting applications he "rode with" agent Bass and knew Holliday only when he saw him. The witness admitted that there are things in the policy

which he does not know. He also admitted the interview with respondent after the death and that he directed respondent to the Columbia office of appellant but insisted that, although he knew of the death of respondent's wife and that respondent was seeking money for the funeral expenses, he thought that it was the hospital benefit that was sought. (We interpolate the conflict that the application contained the following: "It is understood and agreed that hospital service under this plan shall not include the treatment of conditions that exist on the date of this application.") The witness was asked whether he had a conversation with one Flake about the policy in suit and whether he had told Flake that he guessed he was "penitentiary bound" because of the insurance, but he had no worry because he had friends; which he denied. He was never a full-time insurance solicitor but took applications from Farm Bureau members who were interested and contacted him. He admitted the conversation with respondent's son, to which the latter testified, that the policy was all right and that respondent should not worry.

The treasurer of the appellant company testified that the latter has a contract with the Farm Bureau to furnish hospital, accidental death and surgery insurance for its members in the State, with the privilege to also sell them life insurance. Appellant would not write life insurance on a person suffering from incurable cancer and its agents are not authorized to represent otherwise. Appellant licensed Farm Bureau directors (which Rish was) to solicit and sell insurance in order to reach more Bureau members.

There was no explanation or reason advanced for the failure of Bass to testify, from which the jury may have inferred that his testimony, if given, would have been contrary to appellant's contentions. *Mickle v. Dixie Security Life Ins. Co.*, 216 S. C. 168, 57 S. E. (2d) 73.

In reply for respondent a Pelion merchant testified that he knew of no insurance solicitor thereabout by the name of

Bass but he did know of one named Holliday. Ebbie Flake, who also lived at that time at Pelion, testified to the same effect and he further contradicted Rish and said that the latter did tell him at the school house, "I reckon I am on the way to the penitentiary for that insurance policy I wrote for Earnest Shumpert," but that he was not worried because he had plenty of friends.

The evidence has been rather fully reviewed because the burden of the appeal is that the trial court should have granted appellant's timely motions for nonsuit, directed verdict and judgment notwithstanding the verdict. The case presents the difficult problem of recognition of the rule of sanctity of written contracts and the rule of relief from fraudulent representations which induced the making of a contract. Recent somewhat similar cases which resulted oppositely to each other are *Thomas v. American Workmen,* 197 S. C. 178, 14 S. E. (2d) 886, 136 A. L. R. 1, and *Branham v. Capital etc. Ins. Co., S. C.,* 66 S. E. (2d) 451. Between these cases in time came *O'Connor v. Brotherhood of Railroad Trainmen,* 217 S. C. 442, 60 S. E. (2d) 884, in which the decision was against the plaintiff (a railroad conductor) upon the grounds of his literacy and intelligence and his failure to exercise care to avert the consequences of the deceit of which he complained. The holding of the *Branham case* may be accurately similarly summarized.

Upon consideration of the evidence here adduced we are constrained to hold that the case falls within the liberal rule of the *Thomas case* [197 S. C. 178, 14 S. E. (2d) 887] and that the issues of fact were properly submitted to the jury with appropriate instructions. It was there said in the opinion: "The policy of the courts is, on the one hand, to suppress fraud; and on the other, not to encourage negligence and inattention to one's own interest. Either course has obvious dangers. But the unmistakable drift is toward the just doctrine that a wrongdoer cannot shield himself from liability by asking the law to condemn the credulity of the ignorant and unwary.

"Whether or not reliance upon a representation in a particular case is justifiable or excusable, what constitutes reasonable prudence and diligence with respect to such reliance, and what conduct constitutes a reckless or conscious failure to exercise such prudence, will depend upon the various circumstances involved, such as the form and materiality of the representations, the respective intelligence, experience, age, and mental and physical condition of the parties, and the relation and respective knowledge and means of knowledge of the parties."

In the case at bar the evidence was sufficient to establish the fraud which the jury found and it was likewise an issue for the jury whether respondent was guilty of such negligence under all of the attendant circumstances as would defeat his cause of action for the fraud. Our earlier decisions upon which appellant relies are found to be not in conflict upon comparison with their respective facts because in each of them the plaintiff was of education and intelligence or had other better opportunity to protect himself or herself from deception than did respondent here. Those cases are: *Frierson v. Inter-Ocean Cas. Co.,* 168 S. C. 178, 167 S. E. 232; *Hood v. Life & Cas. Ins. Co.,* 173 S. C. 139, 175 S. E. 76; *Dukes v. Life Ins. Co. of Va.,* 184 S. C. 500, 193 S. E. 36 *Able v. Equitable Life Assur. Soc.,* 186 S. C. 381, 195 S. E. 652, and *Souba v. Life Ins. Co. of Va.,* 187 S. C. 311, 197 S. E. 826. Decisions of opposite result to the foregoing because of differing facts are: *Williams v. Commercial Cas. Ins. Co.,* 159 S. C. 301, 156 S. E. 871; *Crosby v. Metropolitan Life Ins. Co.,* 167 S. C. 255, 166 S. E. 266; and *Cook v. Metropolitan Life Ins. Co.,* 186 S. C. 77, 194 S. E. 636.

The second ground of appeal imputes error in the following excerpt from the instructions to the jury:

"In other words, Mr. Foreman and Gentlemen of the Jury, the law says that, if a person is able to read and understand an instrument before signing it, he is bound, as a matter of ordinary care, to read the instrument, and if a

person signs an instrument without reading it, when he could have read it and determined its correctness, he is bound by it, even though he might have been misled as to its contents. The law is further well settled that, even though a person cannot read and understand intelligently an instrument which he is about to sign, it is his duty to exercise care for his protection by asking someone who can read to read the instrument for him, and he can protect himself in that way, and does not do it, he is bound by the instrument, even though it is different to what he thought it was. However, when a person is under disability, in so far as education is concerned, and cannot read and understand an instrument, all that he is required to do is to act as a man of ordinary care and prudence would do under the same circumstances, and if he acts as a person of ordinary care and prudence would do under the same circumstances, and is misled to his injury, he has a right to insist upon having been misled and defrauded. If he does not exercise that same care and prudence that a man of ordinary care and prudence would under the same circumstances, he is bound by the instrument and cannot complain."

We find no error or conflict with *O'Connor v. Brotherhood, supra,* as contended by appellant. A preceding portion of the instructions was as follows: "Now I charge you in that connection, as requested by the defendant, that ordinarily one cannot complain of fraud in the misrepresentation of the contents of a written instrument signed by him, when the truth could have been ascertained by reading the instrument, and that one entering into a written contract should read it, and avail himself of every reasonable opportunity to understand its content and meaning."

Appellant complains of the admission in evidence of the conversation and conduct of the agent Rish when informed by respondent of his wife's death and of the refusal of the appellant to pay. It was part of the whole picture, fitted the pattern and tended to prove the guilty knowledge of the agent. It is axiomatic that the allegation

of fraud broadens the field of admissible evidence and the admission of all relevant facts is largely within the discretion of the trial court, of which there was no abuse here. *Southern Iron & Equipment Co. v. Bamberg etc., Ry. Co.,* 151 S. C. 506, 149 S. E. 271, *Halsey v. Minn.-S. C. Land & Timber Co.,* 174 S. C. 97, 177 S. E. 29, 100 A. L. R. 1. *State v. Simmons,* 209 S. C. 531, 41 S. E. (2d) 217.

The fourth and final assignment of error relates to the admission of the reply testimony in contradiction of appellant's witness Rish, first as to its materiality and, second, as to the sufficiency of the foundation for it. The first point is answered by what has been said relating ·to the permissible wide range of the evidence in fraud cases. The second is not supported by the trial record. On cross-examination Rish was put on adequate notice and admitted that he had a conversation with the reply witness about a policy written for respondent. Concerning the discretion of the trial judge with respect to the admission of reply testimony in contradiction of an opposing witness, see *Lusk v. State Highway Dept.,* 181 S. C. 101, 186 S. E. 786.

The exceptions are overruled and the judgment affirmed.

BAKER, C. J., and FISHBURNE, TAYLOR and OXNER, JJ., concur.